



FILED

Aug 07 2019, 1:10 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-LW-181

## Derrick Cardosi
*Appellant (Defendant below)*

—v—

## State of Indiana
*Appellee (Plaintiff below)*

Argued: January 10, 2019 | Decided: August 7, 2019

Appeal from the Newton Superior Court, No. 56D01-1608-MR-2
The Honorable Daniel J. Molter, Judge

On Direct Appeal

**Opinion by Justice Massa**

Chief Justice Rush and Justices David, Slaughter, and Goff concur.

**Massa, Justice.**

Derrick Cardosi was charged with crimes arising from the deaths of three acquaintances. A jury found him guilty of murder, among other things, and sentenced him to life without parole for that crime. Cardosi now directly appeals five issues, arguing that (I) insufficient evidence supported his convictions for auto theft and felony murder, (II) the trial court failed to properly admonish the jurors each time they were separated, (III) the trial court improperly admitted his co-conspirator's post-crime text messages, (IV) the trial court erred by reading a withdrawn accomplice liability instruction, and (V) the trial court improperly considered a non-statutory aggravator when sentencing him to life without parole. Finding each contention without merit, we affirm the trial court.

# Facts and Procedural History

Ricky Thomas, along with his girlfriend Kim Spears and friend Justin Babbs, lived with his Grandma. From time to time, Sebastian Wedding, another of Ricky's friends, lived there too. Wedding's friend Derrick Cardosi lived in an apartment across the street.

One August night, Wedding sent a text message to Cardosi saying that he could get marijuana, with Cardosi responding, "maybe tomorrow bro haha." St. Ex. 125. The next morning, at about six or six thirty, Grandma heard Ricky and Kim talking through a shared bedroom wall, with Kim at one point saying, "Ricky no." Tr. Vol. IV, p.20. Thinking nothing of it, Grandma went back to sleep. Around this time, Wedding and Cardosi exchanged a couple of text messages (later deleted), with Wedding asking if Cardosi was "a go" and telling him that a door was open and that he should "go to work." St. Ex. 124. The two also traded several phone calls during these early morning hours.

When Grandma woke up a few hours later, she went out to the living room to find Justin unresponsive, his head and arm covered with blood. Grandma knocked on Ricky's door to get assistance, but no one responded. Grandma then tried to call for help, but her phone didn't

work. Because an oxygen tank hobbled her mobility, Grandma waited outside her home for help from any passersby. While waiting, she noticed that Ricky's 1997 Mercury Grand Marquis was gone.

Around that time, Cardosi (wearing black shoes with gray soles and a black, cut-off t-shirt reading "Please, KEEP ON THE GRASS") and Wedding entered a Dollar General store and bought a package of Hanes tank tops, two pairs of pants, slippers, and Pampers baby wipes. A few minutes later, Wedding and Cardosi arrived at a nearby gas station in Ricky's car. Wedding, who was driving, parked the car and put the gas pump nozzle into the car's gas tank. Cardosi then got out of the car and returned the nozzle to its holder before opening the trunk and putting two plastic bags inside. After two friends met them there, Cardosi got back into the passenger side of the car, and Wedding then drove them to a nearby lake to hangout. There, while Wedding and one of the friends were speaking alone, Cardosi texted to ask if he was telling the friend "anything [a]bout today." St. Ex. 126. Wedding replied "No." *Id.* When Cardosi later returned to the neighborhood where he and Grandma lived, Wedding asked what was happening "over there." St. Ex. 127. Cardosi responded "nothing since" he had gotten back. *Id.*

Meanwhile, Grandma had flagged down a couple of teenage neighbors passing by. Seeing her in shock, the teenagers ran into the house and called 911 to report that Justin wasn't breathing, had blood all over his body, and that a "chunk" was missing from his neck. Tr. Vol. III, p.34. When emergency personnel arrived, EMTs confirmed that Justin was dead.[1] A police officer then kicked open Ricky's bedroom door and found Kim and Ricky's lifeless bodies inside. Blood was spattered across the walls and the police saw a pry bar next to a cracked-open safe. Ricky's cell phone was also in the room, with the last activity showing a text message sent around midnight. A text message from around ten that morning hadn't been read. The officer found no signs of forced entry into the home

---

[1] This wasn't the first time that officers had been to that house. A few months earlier, officers found a baggie of marijuana on the lawn when they were dispatched there after Ricky and Kim reported that masked burglars stole money from them.

but noted that one of the exterior doors was unlocked. Post-mortem examinations showed Ricky, Kim, and Justin each died from multiple stab wounds.

As the investigation unfolded, Cardosi and Wedding exchanged a flurry of text messages. Cardosi informed Wedding that there was a "[l]ot of activity this way now." St. Ex. 127. Wedding responded that they needed to dispose "of that car like now," with Cardosi replying that they'd "get rid of it tonight." *Id.* Later, when Wedding asked for a ride, Cardosi responded that "cops have [the neighborhood] almost locked down." *Id.* After assuring Wedding that "we all know [you]" didn't commit the murders, Cardosi hoped Wedding had found "somewhere safe for now" and that he wouldn't "tell anyone where" he was. *Id.* Cardosi urged Wedding to "remember" that since he hadn't "been [at Grandma's house] since yesterday," there was "no way" he could be involved in the murders. *Id.* Wedding responded that he was at his grandparents' house and confirmed that he had disposed of the car in a nearby cul-de-sac. As the two ended text messaging for the night, Cardosi told Wedding that "no one knows anything," and that Grandma "says there was no one else in the house." *Id.* After Wedding "thank[ed] god" for this news, Cardosi concluded that the police didn't "have any murder weapons yet." *Id.*

During that text-messaging spree, Wedding's ex-girlfriend visited him at his grandparents' house. While there, Wedding, acting strangely and nervously, offered her gas money and jewelry. This ex-girlfriend then noticed Ricky's car and, after observing Wedding's behavior and learning that Ricky had been murdered, called 911 to report her suspicion that Wedding had killed him.

A few hours later, police arrested Wedding at his grandparents' house, seizing his cell phone in the process. Officers found Ricky's car in the nearby cul-de-sac, just a three-minute walk from his grandparents' house. In and around the car, officers found a Dollar General bag, a price tag for shoes, a package of Pampers baby wipes, Hanes tank top packaging, two black shoes with gray soles, a black rubber glove, and a black, cut-off t-shirt reading "Please, KEEP ON THE GRASS." Officers also found a cell

phone likely belonging to Ricky's mother, a white plastic bag, a red bandana, a paper towel, a cloth, a pair of sweatpants, a black hooded sweatshirt, bloody sheathed knives belonging to Cardosi and his roommate, a camouflage jacket, and a grey bandana.

The next day, officers arrested Cardosi at his home and seized his cell phone too. The phone revealed that, in the days after the deaths, Cardosi had visited numerous websites with stories about the three homicides, the police investigation, the victims' autopsies, and Wedding's arrest. Although Cardosi eventually acknowledged that he and Wedding had talked about what to do with Ricky's car on the day the bodies were found, he denied having anything to do with the deaths. But inside Cardosi's home, officers found a bloodstained bedsheet and a box of black rubber gloves. Forensic testing later showed DNA profile matches for Ricky, Kim, Justin, and Cardosi on that sheet and the items found in and around Ricky's car: blood on the **sheet** matched Justin's profile; the **knives** found near the car had blood with DNA consistent with Justin, Kim, Ricky, and Cardosi; blood on the **black rubber gloves** found near the car had DNA consistent with Justin and Ricky; blood on the **black shoes with gray soles** had DNA consistent with Cardosi, Justin, Ricky, and Kim; blood on the black **"Please, KEEP ON THE GRASS" t-shirt** had DNA consistent with Ricky; and blood on the **sweatpants** had DNA consistent with Cardosi, Ricky, Kim, and Justin.

The State then charged Cardosi with (1) murder, knowing or intentional killing of Justin; (2) murder, knowing or intentional killing of Ricky; (3) murder, knowing or intentional killing of Kim; (4) assisting a criminal (Wedding) by communicating police actions at the crime scene; (5) assisting a criminal (Wedding) by disposing of evidence; (6) auto theft of Ricky's vehicle; (7) theft of a gaming system and electronic tablet found in the back of the Grand Marquis; (8) felony murder of Ricky while committing or attempting burglary; and (9) felony murder of Ricky while committing or attempting robbery. *See* Ind. Code §§ 35-42-1-1 (2014), 35-44.1-2-5(a)(2) (2016), 35-43-4-2.5(b)(1) (2014), 35-43-4-2(a) (2014).

A jury trial followed, with the theft charge being dropped. After voir dire, during preliminary instructions, and several times during the trial

(but not every time the jurors separated), the court admonished the jurors that, while they could discuss the case in the juror room together, they couldn't talk about the case in any other instance. During the trial, and over Cardosi's objection, the trial court admitted the text messages Cardosi exchanged with Wedding.

At the end of the trial, while the court read the final instructions, counsel for the State and Cardosi asked to discuss an instruction. After the jury left the courtroom, Cardosi asked the court to supplement a not-yet-given instruction on accomplice liability. The State, however, suggested removing the accomplice liability instruction altogether. Cardosi agreed to the removal after consulting with counsel. The court, in turn, agreed to omit any reference to accomplice liability. But after reconvening the jury and continuing with the final instructions, the court inadvertently read one of the withdrawn instructions.

After concluding giving its final instructions to the jury, and after the jurors retired to deliberate, the trial court acknowledged its mistake but noted that the instruction was omitted "from the written instructions we're going to give the jury." Tr. Vol. V, p.129. Cardosi then objected, noting his belief that the instruction "didn't properly advise on the elements of intent of the principal and the agent." *Id.* In response, the court opined that the instruction said "nothing about" convicting Cardosi as an accomplice. *Id.* The trial court concluded that, although it "would have liked to have avoided" reading it, its reading was harmless because it didn't "direct the jury to do anything that has to do with the case." *Id.* at 130, 129.

The jury then found Cardosi guilty of all the crimes charged. At the sentencing portion of trial, the State sought life without parole for the murder convictions. Along with incorporating all the evidence from the guilt phase, the State presented evidence that Cardosi had possessed marijuana stolen from Ricky's house and that Wedding had intended to sell that marijuana and the electronic devices found in the car. To the detective presenting this evidence, this was a "classic example of a burglary or robbery case where subjects enter a residence, take something from the residence[,] and leave." Tr. Vol. V, p.141.

Ultimately, the jury determined that the State proved the existence of three statutory aggravating circumstances beyond a reasonable doubt, finding that Cardosi committed murder by intentionally killing the victims (1) while committing or attempting to commit burglary, (2) while committing or attempting to commit robbery, and (3) when he had committed another murder. *See* I.C. § 35-50-2-9(b)(1)(B), (b)(1)(G), (b)(8) (2016). After resolving this, the jurors found that the aggravators outweighed any mitigators, and recommended a life sentence without parole. *See* I.C. § 35-50-2-9(l).

The court, after merging the felony-murder convictions with the knowing/intentional murder verdicts, then sentenced Cardosi consistent with this binding recommendation. *See* I.C. § 35-50-2-9(e). When imposing this sentence, the trial court adopted the mitigators offered by Cardosi, including his age, his minor child, his family's hardship, and his inability to recover from drug abuse. Along with the statutory aggravators found by the jury, the trial court considered the "brutality of these offenses of murder." Tr. Vol. V, p.176.[2] After Cardosi objected to this consideration, the trial court replied that it was merely addressing the "[m]ultiple offenses" of murder. *Id.*

Cardosi now directly appeals. *See* Ind. Appellate Rule 4(A)(1)(a) ("The Supreme Court shall have mandatory and exclusive jurisdiction over . . . Criminal Appeals in which a sentence of . . . life imprisonment without parole is imposed.").

## Discussion and Decision

Cardosi argues five issues, contending that

---

[2] In a sentencing order issued after the hearing, the trial court, on top of memorializing all the factors it discussed at the hearing, also noted "that the acts were committed at a time of the day when the victims were most vulnerable when the victims were asleep and had no meaningful way to defend themselves and that the crimes were calculated with a co-perpetrator." App. Vol. III, p.105.

I.   insufficient evidence supported his convictions for auto theft and felony murder,

II.  the trial court failed to properly admonish the jury each time they were separated,

III. the trial court improperly admitted Wedding's post-crime text messages,

IV.  the trial court erred by reading the withdrawn accomplice liability instruction, and

V.   the trial court improperly considered non-statutory aggravators when sentencing him to life without parole.

We address each argument below.

# I.  Cardosi's insufficient-evidence arguments fail.

When a defendant challenges the sufficiency of the evidence supporting a conviction, "we neither reweigh evidence nor judge witness credibility." *McCallister v. State*, 91 N.E.3d 554, 558 (Ind. 2018). Instead, this Court will "consider only the evidence most favorable to the judgment together with all reasonable inferences that may be drawn from the evidence." *Id.* If substantial evidence supports the judgment, we'll affirm the convictions. *Id.*

Cardosi argues that the State presented insufficient evidence to support his convictions for auto theft and two counts of felony murder. We address both convictions in turn.

## A.  Sufficient evidence supports Cardosi's auto-theft conviction.

A defendant is guilty of auto theft if he "knowingly or intentionally exerts unauthorized control over the motor vehicle of another person, with intent to deprive the owner of . . . the vehicle's value or use." I.C. § 35-43-4-2.5(b)(1). Ordinarily, "an individual's mere presence as a passenger in a stolen automobile" can't support a conviction for auto

theft. *Irvin v. State*, 501 N.E.2d 1139, 1140 (Ind. Ct. App. 1986); *see also Fortson v. State*, 919 N.E.2d 1136, 1143 (Ind. 2010) (holding that "the mere unexplained possession of recently stolen property standing alone does not automatically support a conviction for theft"). But even in cases with no "direct evidence that [a defendant] was ever behind the wheel of" a stolen car, we will affirm an auto-theft conviction if other substantial evidence supports it. *Alvies v. State*, 905 N.E.2d 57, 62 (Ind. Ct. App. 2009) (holding that a reasonable jury could conclude that the defendant was guilty of auto theft when he "took part in the initial burglary," "rode in the car on the way to the woods," and "was in the car when it left the scene of the murder").

Cardosi argues that the State provided no evidence that he stole Ricky's Grand Marquis. Instead, Cardosi insists, only Wedding could be charged with auto theft because it was found near **his** grandparents' house and surveillance footage showed **him** driving the car. The State counters that, despite Wedding driving the vehicle, Cardosi used it for his own purposes without Ricky's permission.

Like the defendant in *Alvies*, no evidence showed Cardosi was "behind the wheel of" the stolen vehicle. But, also like the defendant in *Alvies*, other substantial evidence supports his conviction. Cardosi rode in the Grand Marquis with Wedding to Dollar General, and then to the gas station where they met up with friends. While there, Cardosi put gas in the car, opened the trunk, put bags in the trunk, and closed the trunk. Cardosi then rode in the car with Wedding and the friends to a local lake, where Cardosi texted Wedding about getting rid of the car. Later that night, Cardosi and Wedding again texted about ditching the car, which Wedding had temporarily abandoned in a cul-de-sac near his grandparents' house. When officers found the car, they discovered incriminating evidence in and around it. Finally, after he was in police custody, Cardosi admitted to an investigating officer that he and Wedding discussed how to dispose of the car. Although no evidence shows Cardosi drove the vehicle, substantial evidence supported his conviction for auto theft because he used the car to travel around and to cover up crimes with his co-conspirator.

## B. We needn't address Cardosi's felony-murder challenge because the court merged those verdicts with his murder convictions.

A defendant commits felony murder if he "kills another human being while committing or attempting to commit," among other things, burglary or robbery. I.C. § 35-42-1-1(2). The State charged Cardosi with felony murder for killing Ricky while committing burglary and robbery. Cardosi argues that the State failed to provide sufficient evidence to convict him for felony murder because "there was no evidence" that he killed Ricky while committing burglary or robbery.

The State contends that Cardosi's challenge fails because the trial court merged Cardosi's felony-murder convictions with the three murder verdicts. We agree. As this Court has held before, when a trial court merges a felony-murder and murder conviction, we don't need to address the sufficiency of the evidence supporting the felony-murder conviction because there is no judgment on that charge. *Cutter v. State*, 725 N.E.2d 401, 407 n.2 (Ind. 2000); *see also Alford v. State*, 699 N.E.2d 247, 252 (Ind. 1998) ("Because the trial court merged the felony murder conviction into the murder conviction any claim of error with respect to the felony murder charge is moot."). "There being no judgment to appeal from," Cardosi's claim fails. *See Bd. of Comm'rs of Marion Cty. v. Hutson*, 55 Ind. App. 447, 447, 103 N.E. 1090, 1090 (1914).

## II. Because Cardosi doesn't show how any harm or potential for harm was substantial, any error in the trial court's admonishments wasn't fundamental.

Instructing the jury is a matter within the discretion of the trial court, and we'll reverse only if there's an abuse of that discretion. *Pattison v. State*, 54 N.E.3d 361, 365 (Ind. 2016).

Trial courts must "admonish the jurors in the preliminary instruction, before separating for meals, and at the end of the day," to inform them of "their duty not to converse among themselves or permit others to

converse with them on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them." I.C. § 35-37-2-4(a) (1981).[3] Failure to provide this admonishment, however, doesn't lead to automatic reversal. Instead, a defendant must show he was "harmed by failure of the court to instruct or admonish the jury as to conduct during recess." *Brown v. State*, 245 Ind. 604, 608, 201 N.E.2d 281, 283 (1964); *see also Merry v. State*, 166 Ind. App. 199, 216, 335 N.E.2d 249, 259 (1975) ("[I]t is incumbent on the defendant to show prejudice by the failure to admonish.").

Cardosi concedes that he "failed to object throughout his trial" to what he considers inadequate jury admonishments, waiving his argument for traditional appellate review. Br. of Appellant at 22. *See Lake v. State*, 565 N.E.2d 332, 335 (Ind. 1991) (reiterating that, "while the terms of the statute are mandatory in their call for an admonition of the jurors at specific times, no error is preserved for appeal where there was no objection interposed at the time of the action complained of"). Waiver aside, Cardosi claims fundamental error. This exception is "extremely narrow and encompasses only errors so blatant that the trial judge should have acted independently to correct the situation." *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018) (internal quotation marks removed). We afford relief under this standard "only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Hale v.*

---

[3] In his appellant's brief, Cardosi cites Indiana Code section 34-36-1-5 for the proposition that the trial court erred by inconsistently admonishing the jury. But that statute applies to civil cases, while here we are presented with a criminal case. Generally, appellate arguments "must be supported by citations to the authorities" on which they rely. Ind. Appellate Rule 46(A)(8)(a). And failing to do so "waives those arguments for our review." *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015). Whenever possible, however, "we prefer to resolve cases on the merits instead of on procedural grounds like waiver." *Id.* (internal quotation marks removed). Despite Cardosi citing the wrong statute to support his argument, his "non-compliance with the rule" doesn't "impede our consideration of the issue raised" because we can readily determine that section 34-36-1-5's criminal equivalent is section 35-37-2-4(a). *See id.* (internal quotation marks removed).

*State*, 54 N.E.3d 355, 359 n.2 (Ind. 2016) (internal quotation marks removed).

During Cardosi's trial, the court admonished the jury (1) after jury selection and before adjournment on the first day, (2) during preliminary instructions, (3) at the end of the second day, (4) at the end of the third day, (5) at the end of the fourth day, (6) before lunch on and at the end of the fifth day, and (7) after the jury returned its verdict on the eighth day. At most, the trial court failed to admonish jurors before six meals and at the end of two days during Cardosi's eight-day trial.

To be sure, the trial court didn't strictly adhere to the command of section 35-37-2-4(a). But this deficiency didn't amount to fundamental error because Cardosi hasn't shown that any "harm or potential for harm is substantial." *See Hale*, 54 N.E.3d at 359 n.2. Cardosi's closest claim to harm is that he was "charged and convicted of the most serious felony available in Indiana, Murder." Br. of Appellant at 24. But "harm is not shown by the fact that a defendant was ultimately convicted." *Pope v. State*, 737 N.E.2d 374, 380 (Ind. 2000). Indeed, on appeal, Cardosi doesn't challenge the sufficiency of the evidence supporting his murder convictions.[4] Because Cardosi failed to show any substantial harm or potential for substantial harm, any trial court error wasn't "so prejudicial to the rights of the defendant as to make a fair trial impossible." *Shoun v. State*, 67 N.E.3d 635, 640 (Ind. 2017).

---

[4] Certainly, Cardosi argues that insufficient evidence supported his **felony**-murder convictions. *See infra* section I. But the trial court merged these verdicts with Cardosi's first-degree-murder convictions, which he doesn't challenge as unsupported by sufficient evidence.

## III. The trial court didn't violate Cardosi's Confrontation Clause rights because Wedding's post-crime text messages weren't testimonial.

Although a trial court generally has broad discretion in ruling on the admissibility of evidence, when a defendant challenges the admission as a constitutional violation of his rights, we review the issue de novo. *Dycus v. State*, 108 N.E.3d 301, 303–04 (Ind. 2018).

The Sixth Amendment's Confrontation Clause provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the U.S. Supreme Court held that this clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53–54 (2004). Though leaving "testimonial statement" undefined, the Court stated that the label "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. In other words, the "core" types of testimonial statements protected under the Confrontation Clause are

> [1] *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;

> [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [or]

> [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51–52 (cleaned up).[5]

A few years later, in the combined cases of *Davis v. Washington* and *Hammon v. Indiana*, the Court held that statements made to a 911 emergency operator during and shortly after an attack **weren't** testimonial, while statements made to police officers after a victim was isolated from her abuser **were** testimonial. 547 U.S. 813, 828, 832 (2006). Declaring a new "primary purpose" test, the Court explained that the statements to the 911 operator were made with the primary purpose of helping end an ongoing emergency, while the statements to the police officers were made with the primary purpose of establishing past events potentially relevant to a later criminal prosecution. *Id.* at 822. In sum, the statements to the 911 operator didn't violate the Confrontation Clause, while the statements to the police officers did.

Five years later, in *Michigan v. Bryant*, the Supreme Court held that a dying victim's statements about his assailant weren't testimonial because the conversation's primary purpose was to end an ongoing emergency. 562 U.S. 344, 377–78 (2011). While emphasizing that courts must consider "all of the relevant circumstances" when determining the primary purpose of a statement, the Court clarified that an "ongoing emergency" wasn't the only circumstance where a nontestimonial statement could be made. *Id.* at 369. In fact, "whether an ongoing emergency exists is simply one factor" in a court's inquiry, with the formality of the questioning serving as another. *Id.* at 366, 377. Ultimately, the Court determined that a statement is testimonial if—considering all the circumstances and viewed objectively—the primary purpose of the conversation was to create "an out-of-court substitute for trial testimony." *Id.* at 358.

---

[5] The parenthetical "(cleaned up)" signifies that the author "has removed extraneous, non-substantive material like brackets, quotation marks, ellipses, footnote reference numbers, and internal citations; may have changed capitalization without using brackets to indicate that change; and affirmatively represents that the alterations were made solely to enhance readability and that the quotation otherwise faithfully reproduces the quoted text." Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143, 154 (2017).

Applying this test in *Ohio v. Clark*, the Supreme Court held that the trial court's admission of statements made by a three-year-old boy to his teachers identifying his mother's boyfriend as the source of his injuries didn't violate the Confrontation Clause. 135 S. Ct. 2173, 2181 (2015). Looking at all the circumstances objectively, the Court determined that the statements weren't made with the primary purpose of creating evidence for prosecution. *Id.* Instead, the primary purpose of the conversation was to protect the child. *Id.* While declining to categorically exclude "statements to individuals who are not law enforcement officers" from Sixth Amendment protections, the Court recognized that statements to these individuals "are significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* at 2182.

We most recently applied this test in *Ward v. State*, 50 N.E.3d 752 (Ind. 2016). There, a woman named her boyfriend as her batterer to a paramedic and a forensic nurse who were treating her injuries. *Id.* at 753. When the woman couldn't take the stand, the State successfully sought to admit the statements of the health professionals instead. *Id.* at 753–54. Though at trial and on appeal the woman's boyfriend argued that admission of the evidence violated his Confrontation Clause rights, we held her statements were nontestimonial because asking the woman who attacked her was "a vital part of providing appropriate medical and psychological treatment and service referrals." *Id.* at 754. First, the paramedic obtained the name of the attacker to make sure the batterer wasn't near, ensuring the "obviously battered victim who apparently was suffering in pain" was safe. *Id.* at 760. And second, the nurse "*needed* to know who beat [the woman] in order to classify her status while in the hospital," "discharge her home to a safe place," "and make proper post-discharge referrals." *Id.* at 763. Because the primary purpose of neither conversation was to gather information to create a substitute for trial testimony, their admission didn't violate the Confrontation Clause.

Cardosi argues that his Sixth Amendment rights were violated when Wedding's post-crime text messages were admitted because he and Wedding could "reasonably expect" the statements "to be used against

them in a criminal prosecution." Reply Br. of Appellant at 6.[6] Cardosi borrows the phrase "reasonably expect" from *Crawford*'s list of examples of the core types of statements considered testimonial. *Id.* at 5. But, contrary to Cardosi's position, *Crawford*'s list—which includes in-court testimony, affidavits, pretrial custodial statements, depositions, and so on—shows that any expectation of use at trial isn't based on a defendant knowing a statement is incriminatory.

Instead, the Sixth Amendment compels us to look at the circumstances objectively to determine whether the statements were made with the primary purpose to create "an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358. These circumstances include whether the statements were made with the primary purpose of ending an ongoing emergency, whether the statements were made in a formal setting, and whether the statements were made to law enforcement personnel. *See Clark*, 135 S. Ct. at 2180, 2182. Wedding made the statements to try to **conceal** an ongoing emergency instead of to end one. Wedding made the statements **informally** over text messages—with most being later deleted—instead of permanently memorializing them in a formal setting. And Wedding made the statements **to a co-conspirator** instead of to law enforcement personnel. An objective analysis of the circumstances shows that Wedding's text-message statements weren't testimonial. Rather than serving as out-of-court substitutes for trial testimony, the messages were

---

[6] Cardosi separately argues that Wedding's text messages were inadmissible hearsay under the Indiana Rules of Evidence. To be sure, as Cardosi correctly notes, Indiana Evidence Rule 804(b)(3) bars courts from admitting any "statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused." But for any statement to be hearsay, it must be "offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c)(2). Wedding's text messages weren't offered to prove the truth of the matters asserted by Wedding. Instead, they provided context for Cardosi's own incriminating text messages, like what he meant when he said "lot of activity this way now," "we will get rid of it tonight," "[d]id you thoroughly get it done," and "so far no one knows anything." St. Ex. 127. Because statements "providing context for other admissible statements are not hearsay," *Mack v. State*, 23 N.E.3d 742, 754 (Ind. Ct. App. 2014) (internal quotation marks removed), *trans. denied*, Wedding's text messages were properly admitted.

created for the primary purposes of planning and covering up crimes. *Cf. Bryant*, 562 U.S. at 358 ("[T]he most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial."). Because Wedding's text messages weren't testimonial, their admission didn't violate Cardosi's Sixth Amendment rights.

## IV. Even if the trial court abused its discretion by reading the withdrawn accomplice liability instruction, any error was harmless.

A trial court has discretion when instructing the jury, and we'll reverse only if it abuses that discretion. *Pattison*, 54 N.E.3d at 365.

Cardosi argues simply that the trial court "erred" by inadvertently instructing that "'particular facts and circumstances of each case must be considered in determining whether a person participated in the commission of the offense as an accomplice.'" Br. of Appellant at 27 (alterations removed) (quoting Tr. Vol. V, p.124). But error alone isn't enough. Despite correctly noting that "[t]his Court will reverse a conviction only if the appellant demonstrates that the instruction error prejudices his substantial rights," Br. of Appellant at 26 (citing *Hall v. State*, 769 N.E.2d 250, 254 (Ind. Ct. App. 2002)), Cardosi points to no prejudice, and we independently find none. "Instructional error is harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise." *Inman v. State*, 4 N.E.3d 190, 200 (Ind. 2014) (internal quotation marks removed).

Here, the accomplice instruction was tethered to no specific charge, so it is hard to discern, without his guidance, which conviction Cardosi believes isn't supportable without the instruction being given. But strong evidence sustains all his convictions. The day before the murders, Wedding and Cardosi texted about obtaining marijuana the next day. The morning of the murders, they exchanged several early phone calls and texted about whether Cardosi was "a go," with Wedding telling Cardosi

to "go to work." Later that day, Cardosi arrived in Ricky's stolen car at Dollar General while wearing clothes that were later found near the abandoned car. While at Dollar General, the two purchased items also later found around the vehicle. Cardosi arrived at a gas station in the stolen car, helped fill it with gas, and placed items into its trunk. After arriving at the lake, Cardosi asked if Wedding was telling a friend "anything [a]bout today." Once the two returned to their homes, Cardosi and Wedding exchanged several texts about the police investigation and the disposal of the car. When police officers discovered the stolen car, they found, along with the clothing and items purchased at Dollar General, bloody knives belonging to Cardosi and his roommate (all the victims died from multiple stab wounds) and a black, rubber glove (the same style found in Cardosi's house along with a bloody sheet). All these items, including the clothing and items purchased at Dollar General, had DNA matches for either the victims or Cardosi. In the days following the murders, Cardosi used his phone to search the internet almost seventy times for information about the murders. And while in custody, Cardosi admitted to police officers that he and Wedding discussed getting rid of the stolen car.

Because this mass of evidence supports each of his convictions—for the murders of Justin, Ricky, and Kim, for assisting Wedding by communicating police action at the crime scene and by disposing of evidence, and for auto theft—no error in giving the accomplice instruction prejudiced Cardosi's substantial rights, so the trial court didn't abuse its discretion.

## V. The trial court didn't manifestly abuse its discretion when—consistent with the jury's binding recommendation—it sentenced Cardosi to life without parole.

Because trial courts enjoy wide discretion in sentencing, we'll reverse a sentence "'only upon a showing of a manifest abuse of that discretion.'"

*Weisheit v. State*, 26 N.E.3d 3, 19 (Ind. 2015) (quoting *Sims v. State*, 585 N.E.2d 271, 272 (Ind. 1992)).

Cardosi asserts that the "trial court erred by considering non-statutory aggravating circumstances" (the "brutality" of the murders) when sentencing him to life without parole. Br. of Appellant at 29. Specifically, Cardosi asserts the trial court violated the mandate of *Bivins v. State*, which held that judges and juries are confined to considering aggravators specified in the statute permitting the death penalty or life without parole. 642 N.E.2d 928, 955 (Ind. 1994); *see* I.C. § 35-50-2-9.

But the trial court's consideration of any non-statutory aggravating circumstance was inconsequential because "there is only one sentencing determination, which is made by the jury, and the judge must apply the jury's determination." *Stroud v. State*, 809 N.E.2d 274, 287 (Ind. 2004). In other words, any later musing by the judge was irrelevant when the court was bound by the jury's recommendation of life without parole. *See, e.g.*, *McCallister*, 91 N.E.3d at 565 ("It was the *jury*, not the court, that found the . . . aggravator beyond a reasonable doubt, weighed it against mitigating circumstances, and unanimously determined the proper sentence was life without parole."). Here, the jury recommended life without parole based solely on statutory aggravators with no evidence showing it considered any other aggravating circumstances.[7]

And even if the jury or trial court had considered non-statutory aggravators, a sentence may still be upheld if other valid aggravating circumstances exist. *Baumholser v. State*, 62 N.E.3d 411, 417 (Ind. Ct. App. 2016), *trans. denied*. The jury determined that the State had proven three statutory aggravators. Despite potentially challenging the sufficiency of

---

[7] Even if the trial court independently sentenced Cardosi, its additional contemplation merely "provide[d] an appropriate context for consideration of" an aggravator. *See Prowell v. State*, 687 N.E.2d 563, 567 (Ind. 1997). Indeed, "trial courts are given some latitude in describing the nature of the statutory aggravating circumstance in order to determine the appropriate weight to give it." *Warlick v. State*, 722 N.E.2d 809, 812 (Ind. 2000). Here, the trial court's reflection about the brutality of the crimes explained the increased weight given the multiple-murder aggravator by specifically noting that the murders were committed at night while the victims were at their most vulnerable.

the "burglary" and "robbery" aggravators,[8] Cardosi doesn't dispute the "multiple-murder" aggravator, an aggravating circumstance this Court considers especially weighty. *See Isom v. State*, 31 N.E.3d 469, 494 (Ind. 2015). Because this weighty aggravator found by the jury remains uncontested, Cardosi's sentence of life without parole is independently supported by a valid statutory aggravating circumstance. We conclude that the trial court didn't abuse its discretion by sentencing Cardosi to life without parole.

# Conclusion

We affirm Cardosi's convictions and sentence because (I) sufficient evidence supports Cardosi's auto-theft conviction and we needn't address his felony-murder challenge, (II) any error in the trial court's admonishments wasn't fundamental, (III) the trial court didn't violate Cardosi's Confrontation Clause rights, (IV) any error in reading the withdrawn accomplice liability instruction was harmless, and (V) the trial court didn't manifestly abuse its discretion when it sentenced Cardosi to life without parole.

Rush, C.J., and David, Slaughter, and Goff, JJ., concur.

---

[8] In the "insufficient evidence" section of his appellate brief, Cardosi contends that "no evidence" showed he killed Ricky while committing burglary or robbery. Br. of Appellant at 19. But—on top of Cardosi admitting he and Wedding stole Ricky's Grand Marquis—he at times lived at Grandma's house and was familiar with the home (including knowing when its exterior doors were unlocked), he and Wedding discussed obtaining marijuana the night before the murders, Grandma's house was robbed by masked intruders with marijuana found on the lawn a few months earlier, Grandma overheard Kim say "Ricky no" just before the murders, Wedding told him he should "go to work" that morning, a cracked-open safe was found in Ricky's bedroom with a pry bar nearby, the likely cell phone of Ricky's mother was found near the Grand Marquis, and electronic devices were found in the Grand Marquis with evidence showing that Wedding and he planned to sell those items along with stolen marijuana.

ATTORNEYS FOR APPELLANT
Linda L. Harris
Harry J. Falk
Kentland, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana