# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 12 2020, 8:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Carlos I. Carrillo
Carrillo Law LLC
Greenwood, Indiana

ATTORNEY FOR APPELLEE

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tilibua Elizabeth Springs, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 12, 2020 <br><br> Court of Appeals Case No. <br> 19A-CR-2955 <br><br> Appeal from the Tippecanoe <br> Superior Court <br><br> The Honorable Kristen E. McVey, <br> Judge <br><br> Trial Court Cause No. <br> 79D05-1806-CM-2729 |

**Bailey, Judge.**

# Case Summary

[1] Following a jury trial, Tilibua Elizabeth Springs ("Springs") was convicted of False Informing, as a Class A misdemeanor,[1] and sentenced to ninety days executed in community corrections. Springs now appeals. We affirm.

# Issues

[2] We restate the issues as follows:

    1.    Whether there was fundamental error because of the location of Springs's service dog in the courtroom.

    2.    Whether there was fundamental error because the court did not *sua sponte* instruct the jury about the service dog.

    3.    Whether sufficient evidence supports the conviction.

    4.    Whether the sentence is inappropriate.

# Facts and Procedural History

[3] On June 20, 2018, the State charged Springs with False Informing, as a Class A misdemeanor. On November 21, 2019, Springs was tried by jury.

[4] Before the jury was selected, a discussion was held about Springs's service dog, Chewbacca, which is trained to alert Springs before she has an epileptic seizure.

---

[1] Ind. Code § 35-44.1-2-3(d).

The State objected to the presence of the dog, expressing concerns about juror sympathy and noting that Springs had been to court "many times with no dog." Tr. Vol. 2 at 5. The trial court expressed separate concerns about its bailiff, who is allergic to dogs. The court ultimately allowed Chewbacca to remain under the defense table, specifying that a tablecloth would be used so that "the animal's presence may be minimized in terms of exposure to the jury and further so that [the] bailiff . . . may be minimized from harm as well." *Id.* at 13-14. Springs's counsel then asked Springs whether she was comfortable with that arrangement. Springs replied that she was uncomfortable because the tablecloth would block the line of sight between her and Chewbacca. Springs said, "I think the tablecloth needs to be gone so [Chewbacca] has full access to me." *Id.* at 15. The discussion shifted to the overhang of the tablecloth, which draped to approximately knee height on Springs's side of the table. The trial court offered to move the tablecloth "up about six inches on [Springs's] side of the table . . . so that [Springs] may see [Chewbacca] more clearly." *Id.* The court then briefly addressed another matter, after which it asked, "[I]s there anything else we need to address before we bring the jurors in and begin?" *Id.* Counsel for Springs said no. Shortly thereafter, counsel for Springs asked the court, "[S]ince we're sporting a nice black tablecloth, can [the State's table] as well?" *Id.* at 17. The trial court agreed to place a tablecloth on the State's table.

[5] After the jury was selected, there were sidebar discussions off the record. The trial court memorialized the discussions, noting that Springs's counsel had alerted the court that one of the jurors "briefly had social conversation in the

elevator about the fact that the defendant had a dog with her." *Id.* at 24. The court noted that "[n]either party expressed any concern thus no action was taken." *Id.* The court also noted that each counsel table had a tablecloth.

[6] At trial, there was testimony from Danette Ward ("Ward"), a bus driver. Ward testified that on June 19, 2018, Springs boarded Ward's bus with a child in a stroller. Ward told Springs that she had to remove the child from the stroller for safety. Although Springs did not want to comply, she eventually removed the child from the stroller. While Ward drove the bus route, Springs argued with Ward about the stroller policy. When the bus reached Springs's stop, Springs continued to argue and tried to take Ward's picture. Ward, who did not want her picture taken, put her hand up. Springs hit Ward's hand. Springs then exited the bus "on her own free will." *Id.* at 39. Ward testified that she did not push Springs or Springs's phone and that Springs did not fall off the bus.

[7] Lafayette Police Department Officer Steven Prothero ("Officer Prothero") testified that, on June 19, 2018, he responded to a complaint of a battery. Springs reported that she had been battered by a bus driver. According to Springs, there was an argument about a stroller policy. Springs alleged that the driver tried to prevent Springs from taking a picture by shoving her camera. She also said that the driver got up and shoved Springs off the bus, causing her to fall. Springs displayed her purported injuries, showing Officer Prothero an area on her back. Officer Prothero thought that the area resembled "acne that somebody had scratched raw." *Id.* at 61. He did not believe that the alleged

injury was consistent with falling. Officer Prothero photographed Springs's back and a "very minor abrasion on the back of [her] right knee." *Id.* at 64.

[8] Officer Prothero suspected that Springs's report was false, in part because each bus is equipped with a video surveillance system so "drivers know that they are being recorded." *Id.* at 65. Officer Prothero mentioned the surveillance system to Springs, who became "very angry" and accused Officer Prothero of not doing his job. *Id.* at 66. Springs "demanded to press battery charges against the driver" and requested contact information for Officer Prothero's supervisor. *Id.* Officer Prothero later spoke with Ward. He also obtained the surveillance recording, which he said showed that Ward had remained seated. According to Officer Prothero, it appeared that Springs "was the primary aggressor" and that "the driver had exhibited only defensive measures," such as "holding her hands up in front of her face." *Id.* at 68. About two hours into investigating the report, Officer Prothero arrested Springs. The surveillance recording was played for the jury as was a body camera recording from Officer Prothero's interview with Springs. Officer Prothero testified that, while interviewing Springs, he was forced to ignore service calls coming through on his radio.

[9] The court gave the final jury instructions, to which Springs did not object. Among the instructions was that the verdict "should not be based on sympathy or bias." *Id.* at 88. The jury returned a guilty verdict and the matter proceeded to sentencing. Springs informed the trial court that she was confined to a wheelchair, had four possible surgeries coming up, needed regular infusions of IV fluids, needed to be with her service dog, and was essentially homebound

outside of attending court or medical appointments. She explained that she was on military disability and had lost a job as a nanny because of the charge. The State elicited testimony that Springs had prior convictions for Medicaid fraud and false informing, both crimes of dishonesty. The trial court ultimately sentenced Springs to ninety days executed in community corrections.

[10] Springs now appeals.

# Discussion and Decision

## Location of the Service Dog

[11] Springs argues that the court erred by locating Chewbacca under the defense table, "concealing or hiding [the dog] . . . either in part or in full." Br. of Appellant at 9-10. Springs claims that the location effectively refused her access to a public accommodation, contrary to Indiana Code Section 16-32-3-2. In any case, although Springs initially objected to the location of Chewbacca, she failed to object after the court (1) offered to adjust the overhang of the tablecloth to improve the line of sight and (2) asked whether there was anything else it needed to address before selecting a jury. Rather, counsel requested only that a tablecloth be placed on the State's table. Because Springs failed to object to the adjusted line of sight, she waived this issue and may prevail only upon showing

fundamental error.[2]  *See C.S. v. State*, 131 N.E.3d 592, 595 (Ind. 2019).  "An error is fundamental, and thus reviewable on appeal, if it 'made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm.'"  *Id.* (quoting *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018)).

[12]  Springs claims that the location of Chewbacca "affected her ability to participate and/or to assist in her defense and to meaningfully have a fair trial."  Br. of Appellant at 10.  However, the court noted that Chewbacca had "full access" to Springs even before the tablecloth was repositioned.  Tr. Vol. 2 at 16.  Moreover, the record indicates that counsel ably engaged in cross-examination.  Springs has not demonstrated that the truth-finding process was impeded or jeopardized by the location of Chewbacca.  Ultimately, we are not persuaded of trial error—let alone fundamental error—due to the location of the service dog.

## Jury Instructions

[13]  Directing us to caselaw from other states, Springs asserts that the trial court erred by "fail[ing] to instruct the jury regarding the presence of the service dog" when "at least one . . . member of the jury noticed the dog."  Br. of Appellant at 10.  Notably, however, once the trial court was informed that a juror had seen Chewbacca, "[n]either party expressed any concern thus no action was taken."

---

[2] The State claims that Springs failed to argue fundamental error anywhere in her brief, resulting in waiver. We nevertheless elect to review for fundamental error.

Tr. Vol. 2 at 24. Moreover, Springs did not object to the jury instructions or request an instruction about Chewbacca. Under such circumstances, Springs has waived any claim of instructional error and must demonstrate fundamental error to prevail. *See Bowman v. State*, 51 N.E.3d 1174, 1179 (Ind. 2016). To the extent Springs contends that there was a risk of prejudice from fearful or allergic jurors, it is also possible that Chewbacca's presence elicited sympathy—which is why the State objected to the dog's presence. In any case, the court instructed the jury that its verdict "should not be based on sympathy or bias." Tr. Vol. 2 at 88. Thus, we are not persuaded that the court fundamentally erred by failing to give a specific jury instruction regarding Chewbacca. *Cf. Overstreet v. State*, 783 N.E.2d 1140, 1164 (Ind. 2003) (discerning no error where the substance of the jury instruction sought was adequately covered by other jury instructions).

## Sufficiency of the Evidence

[14] "A person may be convicted of an offense only if his guilt is proved beyond a reasonable doubt." I.C. § 35-41-4-1(a). When reviewing a sufficiency challenge, we do not reweigh evidence or reassess witness credibility. *Cardosi v. State*, 128 N.E.3d 1277, 1283 (Ind. 2019). We "consider only the evidence most favorable to the judgment together with all reasonable inferences that may be drawn from the evidence." *Id.* (quoting *McCallister v. State*, 91 N.E.3d 554, 558 (Ind. 2018)). If substantial evidence supports the judgment, we will affirm. *Id.*

[15] A person who "gives a false report of the commission of a crime . . . knowing the report to be false" commits Class B misdemeanor False Informing. I.C. §

35-44.1-2-3(d). Moreover, the offense of False Informing is elevated to a Class A misdemeanor "if it substantially hinders any law enforcement process." *Id.*

[16] Here, there is evidence that Springs reported the commission of a crime. That is, Springs reported that Ward committed battery, an offense that involves a rude, insolent, or angry touching. *See* I.C. § 35-42-2-1(c). Ward testified that she did not touch Springs. Moreover, the State introduced a surveillance recording that contradicted Springs's account of the events. Although Springs claimed that Ward pushed her out of the bus, the recording shows Springs exiting the bus without falling and without contact from Ward. Moreover, although Springs claimed that she fell and injured her back, Officer Prothero testified that the marks on Springs's back were not consistent with falling.

[17] Springs asserts that the surveillance video is inconclusive about whether Ward ever touched Springs. Regardless, Ward said that she did not touch Springs. Springs also asserts that Officer Prothero "had predetermined that Springs was lying." Br. of Appellant at 12. Yet, Officer Prothero gave extensive testimony about the course of his investigation. It is ultimately the fact-finder's role to weigh the evidence. Here, there is sufficient evidence from which a fact-finder could reasonably conclude that Springs knowingly gave a false report of a battery, exposing Springs to at least Class B misdemeanor criminal liability.

[18] As to the elevating circumstance—substantially hindering any law enforcement process—there is evidence that Officer Prothero spent two hours investigating the report when he could have been responding to other calls. Springs baldly

asserts that two hours does not amount to a substantial hindrance. However, we are not aware of caselaw stating as much. Having reviewed the matter, we conclude that there is sufficient evidence from which a reasonable fact-finder could determine that a law enforcement process was substantially hindered.

[19] Sufficient evidence supports the Class A misdemeanor conviction.

# Sentence

[20] Springs notes that "[t]he record does not show that the trial court entered any findings regarding mitigating or aggravating factors or that the trial court balanced any of the same." *Id.* at 15. To the extent Springs is arguing that the trial court abused its sentencing discretion, a court is not obligated to enter a sentencing statement—or address aggravators or mitigators—when imposing a misdemeanor sentence. *See* I.C. § 35-38-1-1.3 (requiring a sentencing statement "[a]fter a court has pronounced a sentence for a felony"); *Morris v. State*, 985 N.E.2d 364, 367 (Ind. Ct. App. 2013) ("[A]buse of discretion review of a sentence, which concerns a trial court's duty to issue a sentencing statement along with its findings of aggravators and mitigators, has no place in reviewing a misdemeanor sentence."), *aff'd in part, rev'd in part on other grounds on reh'g*.

[21] Turning to Springs's claim that the ninety-day sentence is inappropriate,[3] Appellate Rule 7(B) specifies that we "may revise a sentence authorized by

---

[3] The State proceeds assuming that this issue is not moot, noting that the Chronological Case Summary indicates that "Springs may not have begun serving her sentence." Br. of Appellee at 16 n.2.

statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Our 7(B) review should "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). In conducting our review, we are not assessing whether a different sentence would be more appropriate. *See Helsley v. State*, 43 N.E.3d 225, 228 (Ind. 2015). Rather, we are assessing whether the imposed sentence is inappropriate. *See id.* Furthermore, because "sentencing is principally a discretionary function," *Cardwell*, 895 N.E.2d at 1222, we give considerable deference to the court's decision, *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). That deference "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Id.* Ultimately, sentence revision is appropriate only in "exceptional cases." *Livingston v. State*, 113 N.E.3d 611, 613 (Ind. 2018).

[22] Regarding the offense, the ninety-day sentence was authorized by statute. *See* I.C. § 35-50-3-2 (permitting a court to impose "a fixed term of not more than one (1) year" for a Class A misdemeanor). As to the nature of the offense, Springs fabricated a story about a battery—going so far as to claim that marks on her skin were sustained during the alleged crime. Nothing about the nature of the offense warrants appellate revision of the ninety-day sentence.

As to the character of the offender, Springs has prior convictions involving dishonesty—a conviction for Medicaid fraud and a conviction for false informing. Although Springs is a disabled veteran who needs regular medical care, there is no indication that Springs cannot receive adequate care while serving the relatively lenient ninety-day sentence in community corrections.

This is not an exceptional case warranting sentence revision.

# Conclusion

We are not persuaded of fundamental error regarding the location of a service dog during the trial or the lack of a specific jury instruction regarding the dog. Sufficient evidence supports the conviction. The sentence is not inappropriate.

Affirmed.

Crone, J., and Altice, J., concur.