**FILED**

Sep 25 2023, 8:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Susan D. Rayl
Aaron J. Harshman
Morgan B. Brading
Harshman Ponist Smith & Rayl
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Catherine E. Brizzi
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Theodore J. Canonge, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | September 25, 2023 <br><br> Court of Appeals Case No. <br> 22A-CR-2451 <br><br> Appeal from the <br> Hendricks Superior Court <br><br> The Honorable <br> Mark A. Smith, Judge <br><br> Trial Court Cause No. <br> 32D04-2105-F3-8 |

**Opinion by Judge Foley**
Chief Judge Altice concurs.
Judge May dissents with separate opinion.

**Foley, Judge.**

[1]     Theodore J. Canonge, Jr. ("Canonge") challenges the denial of his motion to

suppress evidence obtained from a vehicle search, where law enforcement

brought in a K-9 unit during a traffic stop and the dog alerted to the presence of contraband. He argues that the seizure violated the Fourth Amendment because law enforcement prolonged the traffic stop and otherwise lacked independent reasonable suspicion to conduct the dog sniff. Because we conclude that law enforcement had independent reasonable suspicion to conduct the dog sniff, we affirm the denial of the motion to suppress.

## Facts and Procedural History

[2] Canonge faces four drug-related charges stemming from the discovery of contraband in a vehicle he was driving. Canonge moved to suppress evidence obtained from a search of the vehicle. At a hearing on Canonge's motion, the State presented evidence about a traffic stop conducted on April 22, 2021. The evidence included testimony from the officer who conducted the traffic stop, Officer Kevin Roach of the Avon Police Department ("Officer Roach"), and the officer who later brought his K-9 partner to the traffic stop, Officer Steven Kaspryzk of the Avon Police Department ("Officer Kaspryzk"). The evidence also included footage from a camera installed in Officer Roach's police vehicle.

[3] Officer Roach testified that he saw the driver of a Chevy Malibu commit multiple traffic violations, including changing lanes without proper signaling. He decided to conduct a traffic stop. When Officer Roach activated the lights of his patrol vehicle, he noticed "three (3) occupants moving about in the car, reaching in various locations and then continuously looking back at [his] patrol vehicle." Tr. Vol. II p. 13. When the Chevy Malibu pulled over and stopped, Officer Roach "saw movements continue inside the vehicle," with the

"occupants reaching around[.]" *Id.* at 14. Officer Roach saw the occupants engaged in these movements "a few times at least." *Id.* at 17. From Officer Roach's vantage point, it seemed as though the occupants were "reaching down, across, . . . like in the floorboard area[.]" *Id.* at 18. As Officer Roach approached the vehicle, he observed "backpacks at the floorboard[.]" *Id.*

[4] Before Officer Roach reached the front window to speak with the occupants, he noticed that the driver—Canonge—was already "reaching over" to hand documents to Officer Roach. *Id.* at 17. It seemed to Officer Roach that Canonge was "try[ing] to accelerate [sic] the stop" or "expediate [sic] the stop." *Id.* When asked to clarify why it seemed as though Canonge "was trying to expedite the stop," Officer Roach said: "It's unusual for . . . a driver to present documentation before I even address them." *Id.* Officer Roach testified that he had conducted "around five hundred" traffic stops. *Id.* at 12. Reflecting on that experience, Officer Roach remarked: "I don't believe I've had another traffic stop where I have experienced that." *Id.* at 17. Officer Roach also noted: "[S]ometimes [the driver] may have [the documentation] in their hands, but they are not reaching over to hand it [to] me before I address them." *Id.*

[5] Officer Roach took the documents from Canonge and asked the front-seat passenger for his identification. The front-seat passenger complied with the request. However, Officer Roach observed that the passenger "wouldn't make eye contact" with him and "didn't speak . . . when [Officer Roach] was talking to him[.]" *Id.* Officer Roach thought that the front-seat passenger's conduct was "a little unusual." *Id.* He also noticed that the front-seat passenger was

"smoking a new cigarette, pretty rapidly," which he "kn[e]w to be indicative of a stressful situation for someone." *Id.* at 14. Officer Roach turned his attention to the backseat passenger, who "seemed really nervous" and was sitting completely still in "a statute[-]like state." *Id.* at 17. Officer Roach requested identification and, before that passenger "had the opportunity to answer," Canonge "interjected" and said that the passenger was a minor. *Id.* at 15.

[6] Officer Roach returned to his vehicle and began "running identification, vehicle information, things of that nature." *Id.* His investigatory steps included a criminal-history check through Indiana's MyCase system, which revealed "a couple of drug charges" between Canonge and the other adult occupant. *Id.* at 17. While Officer Roach was using the computer and "conducting [his] typical procedure with a traffic stop," he contacted officers with K-9 partners to inquire about availability for a dog sniff. *Id.* at 34. One officer was Officer Kaspryzk, who was addressing a roadside hazard. Officer Kaspryzk said he would bring over his K-9 partner after finding someone else to address the hazard. Officer Roach began writing a warning "to fill time until [Officer Kaspryzk] got there." *Id.* at 33. Officer Roach testified that he typically gave verbal warnings. When asked why he prepared a written warning on this occasion, he said: "I was waiting for an officer . . . the K-9 officer to arrive to conduct the sniff. So, in the meantime I was occupying my time by writing the warning." *Id.* at 25.

[7] Officer Kaspryzk arrived about thirteen minutes later, which was about twenty-one minutes into the traffic stop. When Officer Kaspryzk arrived, Officer Roach exited his patrol vehicle and directed Canonge and the others to step out

of the Chevy Malibu. Officer Kaspryzk then walked around the vehicle with a K-9 unit certified in detecting the odors of methamphetamine, heroin, cocaine, ecstasy, and marijuana. The dog gave a positive alert at the rear driver's side door. At that point, Officer Roach searched the vehicle, locating items that he suspected consisted of cocaine, methamphetamine, and marijuana.

[8] In lieu of oral arguments, Canonge and the State submitted briefs concerning the motion to suppress. Thereafter, on August 3, 2022, the trial court denied the motion. On September 6, 2022—more than thirty days later—Canonge moved to certify the order for interlocutory appeal. Following a hearing, the trial court granted the motion to certify. This Court later accepted jurisdiction.[1]

---

[1] In a footnote, the State directs us to Appellate Rule 14(B), which governs discretionary interlocutory appeals. The State points out that where a motion to certify was not filed within thirty days of the interlocutory order and the trial court intends to grant the motion, the trial court "shall make a finding that the certification is based on a showing of good cause" and "shall set forth the basis for that finding." Ind. Appellate Rule 14(B)(1)(a). Asserting that the trial court did not identify good cause in granting Canonge's belated motion to certify, the State directs us to caselaw for the proposition that, under the circumstances, we have discretion to dismiss the interlocutory appeal. Notably, the State falls short of requesting dismissal, potentially because—as Canonge points out in his Reply Brief—the CCS entry associated with the hearing on Canonge's motion to certify shows that the State "d[id] not object" to the motion. Appellant's App. Vol. II p. 11. Moreover, although the State directs us to noncompliance with aspects of Appellate Rule 14(B), it is not as though the State claims we lack jurisdiction. To the contrary, the State suggests that dismissal would be on "non-jurisdictional grounds" based on Canonge's failure "to file a timely motion to certify" or "assert, and have the trial court find, good cause for a belated motion[.]" Appellee's Br. p. 6 n.1.

Ultimately, because the trial court certified its interlocutory order and this Court later accepted jurisdiction, we are satisfied that we have jurisdiction to resolve this appeal. *See* App. R. 14(B) ("An appeal may be taken from . . . interlocutory orders if the trial court certifies its order and the Court of Appeals accepts jurisdiction over the appeal.") & 5(B) (generally providing that "[t]he Court of Appeals shall have jurisdiction over appeals of interlocutory orders under Rule 14"). Further, because the State did not object to the motion to certify and does not directly seek dismissal, we elect to reach the merits. *See, e.g.*, *Cardosi v. State*, 128 N.E.3d 1277, 1284 n.3 (Ind. 2019) (noting the appellate preference to resolve cases on the merits whenever possible).

## Discussion and Decision

According to Canonge, the trial court should have granted the motion to suppress evidence because the traffic stop resulted in an unreasonable seizure, contrary to the Fourth Amendment to the United States Constitution.[2]

The Fourth Amendment provides the right to be free from "unreasonable searches and seizures"—a right that applies in Indiana because of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961). To safeguard this right, evidence obtained through an unconstitutional search or seizure is generally excludable at trial. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (recognizing that evidence may be excluded as "fruit of the poisonous tree"). A defendant may seek to exclude evidence by challenging the constitutionality of a search or seizure through (1) a pre-trial motion to suppress or (2) a timely objection at trial. Ind. Criminal Rule 2.7(B). In this case, Canonge is appealing the denial of his motion to suppress the evidence.

When a defendant seeks to suppress evidence obtained through a warrantless search or seizure, the State bears the burden of proving the warrantless search or seizure was constitutional. *Edwards v. State*, 759 N.E.2d 626, 630 (Ind. 2001). In reviewing the denial of a motion to suppress, we defer to the trial court's proximity to the evidence by "construing conflicting evidence in the

---

[2] A traffic stop also implicates protections in Article 1, Section 11 of the Indiana Constitution. *See Marshall v. State*, 117 N.E.3d 1254, 1258 (Ind. 2019). Here, Canonge exclusively relies on the Fourth Amendment in challenging the denial of his motion to suppress.

manner most favorable to the ruling." *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016). In conducting our review, we also consider "substantial and uncontested evidence favorable to the defendant." *Id.* (quoting *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014)). Evaluating the evidence in this way, we decide de novo the legal question of whether the search or seizure was constitutional. *Bunnell v. State*, 172 N.E.3d 1231, 1234 (Ind. 2021); *M.O.*, 63 N.E.3d at 331.

[12] Canonge asserts that the traffic stop resulted in an unconstitutional seizure because law enforcement prolonged the traffic stop to bring in the K-9 unit and conduct a dog sniff. Canonge contends that the prolongment was improper because law enforcement lacked reasonable suspicion to conduct the dog sniff.

[13] A traffic stop is a seizure under the Fourth Amendment. *Marshall v. State*, 117 N.E.3d 1254, 1258 (Ind. 2019). For a traffic stop to comply with the Fourth Amendment, a police officer must have a lawful basis to initiate the stop, which includes "observ[ing] a driver commit a traffic violation." *State v. Keck*, 4 N.E.3d 1180, 1184 (Ind. 2014). Even if there is a lawful basis to initiate the stop, the Fourth Amendment does not condone indefinite seizure. *See generally, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Indeed, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution"—including the length of the seizure—"unreasonably infringes interests protected by the Constitution." *Id.* "[T]he tolerable duration of police inquiries . . . is determined by the seizure's 'mission[.]'" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). In the traffic-stop context, that mission is to "address the traffic violation that warranted the stop . . . and attend to related

safety concerns[.]" *Id.* All in all, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Therefore, although a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer generally "may not do so in a way that prolongs the stop[.]" *Id.* at 355.

[14] One potential unrelated check is to bring in a K-9 unit to conduct a dog sniff. *See id.*; *Caballes*, 543 U.S. at 408–09 (noting that conducting a dog sniff generally does not amount to an unreasonable search). In this context, "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to— 'the stop[.]'" *Rodriguez*, 575 U.S. at 357. In carrying out the traffic stop, an officer must act with reasonable diligence. *See id.* Thus, "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id.* (quoting *Caballes*, 543 U.S. at 497) (alteration in original). Nonetheless, if the traffic stop is prolonged to conduct a dog sniff, the seizure is not per se unconstitutional. *See id.* Rather, the prolonged seizure is permissible as long as the officer has "reasonable suspicion . . . to justify detaining an individual." *Id.* at 355.

[15] Because we resolve this appeal on other grounds, we need not decide whether Officer Roach prolonged the traffic stop so that Officer Kaspryzk could arrive with his K-9 partner. That is, assuming *arguendo* the traffic stop was prolonged, we focus on whether there was reasonable suspicion to conduct the dog sniff.

*Cf., e.g.*, *Kane v. State*, 976 N.E.2d 1228, 1233 n.1 (Ind. 2012) (declining to reach an appellate argument when ultimately resolving the appeal on other grounds).

[16] When an officer briefly detains a person for investigative purposes—*e.g.*, to conduct a dog sniff—the Fourth Amendment "is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot[.]'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "[R]easonable suspicion is an 'abstract' concept that cannot be reduced to 'a neat set of legal rules[.]'" *Kansas v. Glover*, 140 S. Ct. 1183, 1190 (2020) (quoting *Arvizu*, 534 U.S. at 274). "[T]he essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Ultimately, "[b]ased upon that whole picture[,] the detaining officer[] must have a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Id.* at 417–18. Put differently, "[t]he Fourth Amendment requires 'some minimal level of objective justification'" to support detaining the individual. *Sokolow*, 490 U.S. at 7 (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)). Further, to have reasonable suspicion, the officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion'" or "hunch." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)).

[17] As officers appraise the evolving circumstances, they may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 418).

They may also apply ordinary common sense, drawing on "information that is accessible to people generally, not just some specialized subset of society." *Glover*, 140 S. Ct. at 1190. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. For example, an encounter with law enforcement might present conduct "susceptible of innocent explanation" when the conduct is viewed in isolation. *Id.* Yet, when "[t]aken together," the totality of the circumstances "suffice[] to form a particularized and objective basis" to make detention "reasonable within the meaning of the Fourth Amendment." *Id.* at 277–78.

[18] All in all, the necessary level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence," *Sokolow*, 490 U.S. at 7, which involves only "a fair probability that contraband or evidence of a crime will be found," *id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Indeed, "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy[.]'" *Glover*, 140 S. Ct. at 1188 (quoting *Arvizu*, 534 U.S. at 274). In short: "To be reasonable is not to be perfect[.]" *Id.* (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)) (alteration in original). And by requiring reasonableness—rather than insisting on perfection—the Fourth Amendment gives officers "fair leeway for enforcing the law in the community's protection." *Heien*, 574 U.S. at 61 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

[19] In challenging the denial of his motion to suppress, Canonge generally focuses on the observations Officer Roach included in his probable cause affidavit, directing us to favorable testimony indicating that the affidavit "would be a

better resource than [Officer Roach's] memory at the time of the hearing[.]" Appellant's App. p. 11. We must decline Canonge's invitation to reweigh any conflicting evidence and, instead, consider the totality of the circumstances.[3]

[20] As to the totality of the circumstances, Officer Roach testified that he saw movements in the vehicle that began when he activated his police lights and continued when the vehicle stopped. To Officer Roach, the occupants seemed to be reaching toward the floorboard area while looking back toward Officer Roach. Video evidence corroborates the observations of movement, showing Canonge turned backward, at one point bent down and no longer visible through the rear windshield. Ex. A at 1:15–1:20. Officer Roach not only saw movements directed toward the floorboard, but also noticed at least one backpack there. Next, before Officer Roach approached to engage the occupants about the reason for the traffic stop, he saw that Canonge already had his arm extended to hand over documents. This conduct struck Officer Roach as unusual because, after conducting 500 or so traffic stops, no one else had seemingly tried to expedite a traffic stop in this manner. Furthermore, at one point, Canonge interjected to respond on a passenger's behalf, as though Canonge was trying to control and expedite the encounter with Officer Roach. Canonge engaged in this conduct while the other passengers—who Officer

---

[3] Because we resolve this case on other factors, we disregard evidence that Officer Roach consulted MyCase and discovered that the adult occupants of the vehicle at one point had undefined "charges" against them. We leave for another day whether this type of evidence supports a reasonable suspicion determination.

Roach had just seen "reaching around" in the vehicle—seemed nervous. Tr. Vol. II p. 14.

[21] Canonge focuses on whether there are potential innocent explanations for the observed conduct. For example, he argues that any "concern about the occupants' nervousness when being pulled over by police does not give rise to reasonable suspicion because it is understandable that they would be nervous." Appellant's Br. p. 13. We note, however, that although "nervousness alone may not support reasonable suspicion," nervousness "may be considered alongside other circumstances to support such a finding." *Guthery v. State*, 180 N.E.3d 339, 348 (Ind. Ct. App. 2021), *trans. denied*. In any case, we do not disagree with Canonge's suggestion that, taken individually, each of Officer Roach's observations may not give rise to reasonable suspicion. But a reviewing court does not consider these observations in isolation. *See id.* at 349.

[22] Canonge compares his case to *Wilson v. State*, 847 N.E.2d 1064, 1067 (Ind. Ct. App. 2006), *trans. denied* and *Powers v. State*, 190 N.E.3d 440 (Ind. Ct. App. 2022). As for these types of comparisons, the United States Supreme Court has cautioned that caselaw is not necessarily instructive due to differences in the "factual 'mosaic' analyzed for a reasonable-suspicion determination" that "preclude one case from squarely controlling another[.]" *Arvizu*, 534 U.S. at 275 (quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996)). Here, the cited cases are distinguishable in that, although each involves evidence of nervousness, neither involves evidence that a person reached toward a

container when the officer approached. Indeed, the *Powers* Court specifically noted the record "d[id] not reveal furtive movements[.]" 190 N.E.3d at 446.

[23] Ultimately, Officer Roach observed specific behavior that, taken together, gave him a particularized and objective basis to suspect that criminal activity was afoot. Viewing those collective observations in light of Officer Roach's professional experience—as we must—it was reasonable for Officer Roach to seize the occupants of the vehicle for a short time longer to conduct the minimally intrusive investigatory dog sniff. Thus, we conclude that the totality of the circumstances—the whole picture—provided reasonable suspicion to prolong the traffic stop to conduct the dog sniff. *Cf. Arvizu*, 534 U.S. at 277 ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."). Canonge's arguments to the contrary amount to requests to reweigh conflicting evidence, which we must decline. *Cf., e.g.*, Reply Br. p. 12 ("Officer Roach admitted that what he described as 'furtive movements' really was [that] 'their bodies were moving,' and he merely presumed that movement to be reaching." (quoting Tr. Vol. II pp. 27–28)).

[24] Because any prolongment of the traffic stop was supported by reasonable suspicion, the otherwise-lawful seizure was "reasonable within the meaning of the Fourth Amendment." *Arvizu,* 534 U.S. at 277–78. Therefore, the trial court did not err in denying the motion to suppress.

[25] Affirmed.

Altice, C.J., concurs.

May, J., dissents with separate opinion.

**May, Judge, dissenting.**

I respectfully dissent. I would expressly hold Officer Roach unreasonably prolonged the traffic stop so that a dog sniff could occur, and I disagree with the majority's decision to simply assume the stop was prolonged without addressing the issue. In addition, I disagree with the majority's conclusion that sufficient reasonable suspicion arose during the traffic stop to justify holding Canonge until a dog sniff could be performed. Therefore, I would reverse the trial court's denial of Canonge's motion to suppress.

## 1. Length of Traffic Stop

In *Illinois v. Caballes*, the Supreme Court of the United States explained that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005). A traffic stop "justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id*. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. U.S.*, 575 U.S. 348, 350, 135 S. Ct. 1609, 1612 (2015).

"The burden is on the State to show the time for the traffic stop was not increased due to the canine sweep." *Wilson v. State*, 847 N.E.2d 1064, 1067 (Ind. Ct. App. 2006). In contrast to *Caballes*, where one officer performed the

dog sniff while the second officer wrote a traffic citation, 543 U.S. at 406, 125 S. Ct. at 836, Officer Roach held Canonge for approximately twenty minutes before a K-9 officer arrived, a longer period than the approximately ten to fifteen minutes Officer Roach testified a traffic stop typically takes. In addition, while Officer Roach ultimately did not issue **any** ticket to Canonge, Officer Roach testified that he only began writing a warning ticket "to fill time until [Officer Kaspryzk] got there." (Tr. Vol. II at 33.) He began preparing the warning ticket not in reaction to Canonge's traffic violation but because he "was waiting for an officer . . . the K-9 officer to arrive to conduct the sniff." (*Id*. at 25.) Where an officer explicitly admits the writing of a ticket was pretextual, I would explicitly hold that officer unreasonably prolonged the traffic stop beyond the time necessary to address the reason for the stop. *See Wilson*, 847 N.E.2d at 1067 (holding officer unreasonably prolonged traffic stop when he finished writing the warning tickets but continued to detain driver to allow police dog to arrive); *see also Powers v. State*, 190 N.E.3d 440, 445 (Ind. Ct. App. 2022) (holding officer detained driver and passenger beyond the time necessary to complete the purpose of the traffic stop).

## 2. Reasonable Suspicion

[29] Nonetheless, as the majority notes, a prolonged traffic stop is not per se unconstitutional if the officer has reasonable suspicion to justify detaining the individual. Slip op. at ¶ 14. As we explained in *Crabtree v. State*:

> The reasonable suspicion requirement of the Fourth Amendment
> is satisfied if the facts known to the officer at the moment of the

stop are such that a person of reasonable caution would believe that the action taken was appropriate. In other words, the requirement is satisfied where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. Reasonable suspicion entails something more than an inchoate and unparticularized suspicion or hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence.

762 N.E.2d 241, 246 (Ind. Ct. App. 2002) (internal citation and quotation marks omitted).

[30] Because, in my opinion, the evidence rises to nothing more than an inchoate and unparticularized suspicion or hunch, I disagree with the majority's conclusion that Officer Roach had reasonable suspicion to prolong the traffic stop to conduct the dog sniff. In *Wilson*, we held the officer did not have reasonable suspicion to prolong the traffic stop even though the officer observed that the driver "was 'very nervous.' His 'hands were shaking' and he was 'having trouble getting his license and vehicle registration.'" 847 N.E.2d at 1066 (internal citation to record omitted). Likewise, in *Powers*, we held the officer lacked reasonable suspicion to prolong a traffic stop even though both the driver and passenger exhibited "nervous behavior." 190 N.E.3d at 446.

[31] Here, while Officer Roach stated "[t]he passenger in the back seemed really nervous," (Tr. Vol. II at 17), Officer Roach also testified that he did not observe any signs of drug use by anyone in the vehicle. He did not smell any illegal substances or observe any threatening movements. The occupants of the

vehicle also were not sweating, fumbling with materials, or visibly shaking. One of the things Officer Roach found unusual, which the majority relies upon in concluding that there was reasonable suspicion, was that "before Officer Roach approached to engage the occupants about the reason for the traffic stop, he saw that Canonge already had his arm extended to hand over documents." Slip op. at ¶ 20. However, I see absolutely nothing suspicious in a motorist having ready the documents the motorist knows the officer is going to request for inspection. It also is not unusual that occupants of a vehicle will look back after an officer turns on his patrol lights or that some movement will occur inside the vehicle as the motorist retrieves those documents.

[32] The majority distinguishes *Wilson* and *Powers* by stating "that, although each involves evidence of nervousness, neither involves evidence that a person reached toward a container when the officer approached." Slip. op. at ¶ 22. There is nothing unusual about having a backpack or laundry detergent container in one's vehicle, nor is it suspicious to access or rearrange those items or similar items while driving. Even though Officer Roach answered affirmatively when asked if he saw "furtive movements," Officer Roach clarified that what he saw was the occupants' "bodies were moving" and he assumed they were reaching for something. (Tr. Vol. II at 27-28.) He could not see the occupants' hands, and thus, he did not actually observe them concealing anything. *See B.R. v. State*, 162 N.E.3d 1173, 1178 (Ind. Ct. App. 2021) ("Neither shaking nor being visibly nervous is 'furtive.' To establish that a suspect has engaged in furtive movements, the act must connote evasion or

concealment."). Body movement around a container cannot be all that is needed to transform an ordinary traffic stop into a situation where the officer has reasonable suspicion of drug possession. Such a holding dramatically lowers the bar of what is required for an officer to indefinitely detain a motorist pending the arrival of a K-9 officer. As our Indiana Supreme Court observed in *State v. Quirk*, "a combination of irrelevant conduct and innocent conduct, without more, cannot be transformed into a suspicious conglomeration." 842 N.E.2d 334, 343 (Ind. 2006). That, I fear, is what the majority does here, and therefore, I would hold that Officer Roach did not have the requisite reasonable suspicion to prolong the traffic stop of Canonge, and I would reverse the trial court. Accordingly, I respectfully dissent.