

**FILED**

Sep 28 2023, 9:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Elijah Colon Cruz,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

September 28, 2023

Court of Appeals Case No.
22A-CR-383

Appeal from the Marion Superior
Court

The Honorable Angela Dow
Davis, Judge

Trial Court Cause No.
49D27-1910-F4-41255

**Opinion by Judge Crone**
Judges Brown and Felix concur.

**Crone, Judge.**

## Case Summary

[1] Elijah Colon Cruz appeals his conviction for level 4 felony unlawful possession of a firearm by a serious violent felon. Because the trial court did not abuse its discretion when it admitted certain evidence, and because sufficient evidence supported the conviction, we affirm.

## Facts and Procedural History

[2] On the afternoon of October 22, 2019, Morgan Flanagan called 911 to report a man in front of her house on Stuart Street in Indianapolis. She stated to the 911 operator that when she went outside, the man exited his black SUV and approached her. The man began talking about "some light-skinned dude" who he believed lived in her house and was texting the man's girlfriend. State's Ex. 11 at 00:25-00:40. Flanagan relayed that the man was "talking about how he [was] going to shoot [her] house up." *Id.* at 00:30-00:45.

[3] The 911 operator asked if the man had threatened Flanagan with a weapon. She replied that he pulled his gun out, showed it to her, and stated that he had "all kinds of guns in his car". *Id.* at 01:10-01:25, 05:30-05:40. Flanagan described the gun that he showed her as "a small pistol, like a handgun." *Id.* at 03:30-03:45. The man told Flanagan that he had been watching her go in and out of her house "for days." *Id.* at 01:25-01:35. Further, he had tried to speak with her neighbors about who lived in Flanagan's house.

[4] While on the phone with Flanagan, the 911 operator communicated to police the information about the disturbance, including the reference to multiple guns

in the car. Police were en route. Still connected to the 911 call, Flanagan observed the man beginning to drive away from her house, heading north, and then making a right turn. She conveyed his actions to the operator and stated that the man was wearing a red jacket and had braids and facial hair. The operator asked if he was a white male, and Flanagan stated that he was black. She also reiterated that the SUV was black and looked similar to a Durango.

[5] Meanwhile, Officer Mitchel Farnsley had responded to the initial dispatch, which erroneously indicated that the driver of the black SUV was white. Officer Farnsley observed a black SUV near the reported location and stopped it. However, seeing that the driver was black, Officer Farnsley stated, "I'm sorry. I didn't mean to stop you. You can be on your way." Tr. Vol. 3 at 126. Upon returning to his marked police vehicle, Officer Farnsley heard the updated dispatch, which described the driver as a black male with braids. Realizing that the driver matched that description, Officer Farnsley "reinitiated the traffic stop" of the black SUV. *Id* at 127. By then, two other officers had arrived, and they worked together to conduct a "felony stop." *Id*. at 129.[1] Accordingly, the officers drew their firearms and ordered the driver to turn off the vehicle, show his hands, and exit the SUV.

---

[1] Officer Farnsley explained that police "do felony stops when [they] believe a firearm is involved," which prompts concern for officer safety. Tr. Vol. 3 at 129. Here, the 911 dispatch noted the possibility of multiple weapons.

[6] Cruz, the driver, did not initially comply with police commands. Rather, Cruz was "digging around in the vehicle[.]" *Id.* Officer Farnsley, who saw Cruz reaching around in both the center console and passenger side of the SUV, commanded him to stop reaching. Cruz "would occasionally look at the window, stick his head out the driver's window, look at [the officers], and go back to reaching around in the vehicle as if he was trying to hide something or grab something[.]" *Id.* at 130. About a minute after the police commands first started, and after the commands became louder, Cruz exited the SUV. He was ordered to crawl toward the officers and then placed in handcuffs.

[7] Officers opened the SUV's doors to ensure that no one was hiding inside the vehicle. During this protective sweep, Officer Lane Cooper saw a clear knotted plastic baggie containing an orange pill on the front passenger seat. Suspecting that it was illegal drugs, the officers called a narcotics detective, Andrew Girt, to the site. Detective Girt, who likewise suspected narcotics, had Cruz Mirandized and ultimately applied for a search warrant. Cruz inquired about what was going on and quietly asked "if this is all over an X [ecstasy] pill." Tr. Vol. 4 at 32. Soon, Laquisa Sinclair, Cruz's girlfriend, "showed up on scene and she wanted to get into the" SUV to remove her belongings. Tr. Vol. 3 at 133. Officers prohibited her from entering the SUV because they had not finished processing the scene.

[8] Around that time, Cruz, who at first had been argumentative, stopped responding to questions, became "unalert," and began "sloping down into a laying position as if he were exhibiting signs of an overdose." *Id.* at 135, 137.

Officers grew concerned about Cruz's health and called an ambulance to assist. As the officers dealt with Cruz's medical episode, Sinclair opened the door and attempted to enter the SUV. Officers immediately grabbed her and placed her in handcuffs.[2] Medical personnel arrived and transported Cruz to a nearby hospital.

[9] Due to the suspected narcotics, a warrant was issued, and a search of the SUV ensued. In the rear seat area on the driver's side of the SUV, beneath a seat cushion, officers found a black Smith & Wesson M&P .40 Shield semiautomatic handgun. *Id.* at 178, 180. Until an officer flipped up the rear seat cushion, the handgun had not been visible. *Id.* at 180.

[10] Days later, the State charged Cruz with level 4 felony unlawful possession of a firearm by a serious violent felon and level 6 felony possession of a controlled substance. Because Flanagan failed to appear for several hearings and depositions, the trial court granted a defense motion to exclude her testimony. The State filed a motion for a pretrial ruling on the admissibility of the 911 call. Cruz filed a motion in limine requesting the exclusion of the 911 call and a memorandum in support of his motion. Following a hearing on the matter, the trial court determined that the 911 call was nontestimonial and denied Cruz's motion.

---

[2] The State charged Sinclair with level 6 felony attempted obstruction of justice. She was tried as a co-defendant of Cruz and found guilty.

At the conclusion of a bifurcated trial held in December 2021, Cruz was found guilty of the level 4 felony firearm charge and not guilty of the level 6 felony controlled substance charge. In January 2022, the court issued a six-year sentence, none of which was to be served in the Department of Correction. Instead, the court suspended four years and ordered one of those four years to be served on probation. In addition, the court required two years of executed home detention. Cruz appeals.

## Discussion and Decision

### Section 1 – The trial court did not abuse its discretion in admitting evidence regarding the 911 phone call.

Cruz contends that the trial court abused its discretion when it admitted evidence concerning Flanagan's 911 call. He characterizes the 911 call as testimonial. Thus, he maintains that because Flanagan did not testify, the admission of evidence regarding the 911 call violated the Confrontation Clause of the Sixth Amendment. For support, he cites *Crawford v. Washington*, 541 U.S. 36 (2004), *Davis v. Washington*, 547 U.S. 813 (2006), and *Hammon v. Indiana*, 547 U.S. 813 (2006).

"Although a trial court generally has broad discretion in ruling on the admissibility of evidence, when a defendant challenges the admission as a constitutional violation of his rights, we review the issue de novo." *Cardosi v. State*, 128 N.E.3d 1277, 1286 (Ind. 2019). When testimonial evidence is at issue, "the Sixth Amendment demands what the common law required: unavailability

and a prior opportunity for cross examination." *Crawford*, 541 U.S. at 68. Because Cruz had no opportunity to cross-examine Flanagan, her statements during the 911 call were admissible at trial only if they were nontestimonial.

[14] In *Davis*, the Supreme Court considered whether responses to questions asked by a 911 operator were testimonial statements. 547 U.S. at 826. In answering this question, the Court initially observed:

> When we said in *Crawford* … that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. It is, in the terms of the 1828 American dictionary quoted in *Crawford*, "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"… The solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. … A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.

*Id*. at 826-27 (alterations in *Davis*, citations omitted).

[15] The Court then made the following observations concerning the differences between the testimonial statements in *Crawford* and the answers elicited by the 911 operator in *Davis*:

> In *Davis*, [the victim] McCottry was speaking about events as they were actually happening, rather than "describ[ing] past events[.]" Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one might call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

*Id.* at 827 (emphasis and citations omitted). The Court concluded that the primary purpose of the 911 operator's interrogation of McCottry was to "enable police assistance to meet an ongoing emergency. [McCottry] simply was not acting as a witness; she was not testifying." *Id.* at 828 (emphasis omitted). For this reason, the *Davis* Court held that the admission of McCottry's statement

did not violate the defendant's Sixth Amendment right to confrontation. *Id.* at 829, 834.

[16] Here, Flanagan called 911 to report a man who approached her in front of her home, talked about shooting up her house, showed her a handgun, stated that he had multiple guns in his car, revealed that he had been watching her for days, and seemed to be upset because he believed that her housemate was contacting his girlfriend. Flanagan dialed 911 while Cruz was still in front of her house. Her statements and responses to the 911 operator were made not to establish past facts for trial but to obtain emergency assistance to safely deal with an upset, gun-wielding, threatening person at her house. Likewise, the 911 operator's questions were not designed to preserve evidence for a criminal case but to ascertain the nature of the peril (multiple guns, threatening statements/behavior, plus identifying features) to Flanagan and the community at large in order to enable the police to end a dangerous situation. Thus, the 911 call was nontestimonial, and the admission of evidence regarding the call did not violate the Confrontation Clause of the Sixth Amendment. *See Collins v. State*, 873 N.E.2d 149, 155 (Ind. Ct. App. 2007) (concluding that statements to 911 dispatcher had primary purpose of assisting police to meet ongoing

emergency thus were not testimonial, and therefore admission did not violate Sixth Amendment rights), *trans. denied*.[3]

[17] In addition, Cruz now attempts to make a state constitutional argument. On appeal, he claims that the admission of evidence regarding the 911 call violated his "face-to-face" rights under Article 1, Section 13 of the Indiana Constitution. Appellant's Br. at 25. However, an appellant "may not add to or change his grounds for objections in the reviewing court." *Treadway v. State*, 924 N.E.2d 621, 631 (Ind. 2010). Grounds not raised at trial are not properly preserved and, therefore, are waived. *Id.*

[18] In Cruz's memorandum in support of his motion in limine, he requested exclusion of the 911 call evidence. He initially cited both the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution. Yet, his memorandum's analysis covered only the Sixth Amendment, with no discussion of, or citations to, a state constitutional argument. At the final pretrial hearing, the defense raised the Sixth Amendment in support of its motion in limine. Tr. Vol. 2 at 95. The trial court denied the defense's motion and explained that the 911 call was admissible because when Flanagan made the call, there was an "ongoing emergency." *Id.* at 94-96. At

---

[3] In reaching this conclusion, we distinguish *Hammon*, 547 U.S. at 832 (concluding that declarant's identification of defendant as her abuser after alleged attack occurred was testimonial because declarant's "statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation"). Flanagan's statements provided information that enabled officers to immediately end a potentially threatening situation. The fact that Cruz left Flanagan's house after police were dispatched yet before the 911 operator ended the call did not eliminate the emergency nature of the situation.

trial, the defense asked the court to incorporate its objections from the final pretrial hearing. Tr. Vol. 3 at 122. The defense did not raise, and the trial court did not decide, a separate state constitutional argument regarding the 911 call. Thus, Cruz has waived any Article 1, Section 13 argument. *Cf. Ward v. State*, 50 N.E.3d 752, 756 (Ind. 2016) (concluding that defendant preserved Article 1, Section 13 argument where he specifically cited provision during objection and explicitly referenced its "face-to-face" requirement); *see also Griffin v. State*, 16 N.E.3d 997, 1006 (Ind. Ct. App. 2014) (noting that waiver rule protects integrity of trial court, which cannot be found to have erred regarding issue not presented).

[19] In sum, Cruz has not established that the trial court abused its discretion when it admitted evidence of the 911 call.[4]

## Section 2 – The State presented sufficient evidence to support the conviction of unlawful possession of a firearm by a serious violent felon.

[20] Cruz also challenges the sufficiency of the evidence to support his conviction. In reviewing a claim of insufficient evidence, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence that supports the judgment and the reasonable inferences arising therefrom. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). It is "not necessary that the evidence

---

[4] Cruz does not challenge, and we express no opinion on, the validity of the traffic stop.

'overcome every reasonable hypothesis of innocence.'" *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)). "We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021).

[21]   For Cruz's conviction to stand, the record must contain proof beyond a reasonable doubt that he, while being a serious violent felon, knowingly or intentionally possessed a firearm. *See* Ind. Code § 35-47-4-5(c). Cruz does not dispute that he qualified as a serious violent felon. Instead, he asserts that the State failed to establish that he actually or constructively possessed a firearm.

[22]   "A conviction for possession of a firearm may rest upon proof of either actual or constructive possession." *Smith v. State*, 113 N.E.3d 1266, 1269 (Ind. Ct. App. 2018), *trans. denied* (2019). Actual possession occurs "when a person has direct physical control over [an] item." *Sargent v. State*, 27 N.E.3d 729, 733 (Ind. 2015). Constructive possession requires a showing that the defendant had "both the intent and capability to maintain dominion and control over the [handgun]." *Bradshaw v. State*, 818 N.E.2d 59, 62-63 (Ind. Ct. App. 2004).

[23]   Here, the evidence revealed that a black man, with braids and facial hair and wearing a red jacket, showed a handgun to Flanagan and spoke of multiple guns and shooting up her house, just minutes before driving away in a black SUV. Cruz is a black male, who had braids and facial hair and was wearing a red jacket when police stopped him as he drove in a black SUV not far from

Flanagan's house. At the time of the police stop, Flanagan was still on the phone with the 911 operator. Rather than exiting the SUV when police repeatedly asked, Cruz reached around in the vehicle for about a minute as if trying to hide or grab something. A handgun was found beneath the seat cushion behind Cruz's driver's seat. No other occupants were in the SUV. Given the aforementioned properly admitted evidence, the jury could easily determine that Cruz had direct physical control over the handgun and therefore actually possessed it.

[24] Having concluded that the State presented sufficient evidence of actual possession, we need not address whether it also proved constructive possession. That said, we briefly point out that constructive possession "of items found in an automobile may be imputed to the driver of the vehicle." *State v. Emry*, 753 N.E.2d 19, 21-22 (Ind. Ct. App. 2001). Moreover, imputation of constructive possession in Cruz's situation is particularly compelling because he was not just the driver of the SUV but its sole occupant. *Cf. B.R. v. State*, 162 N.E.3d 1173, 1177 n.5 (Ind. Ct. App. 2021) (deeming driver of vehicle to have non-exclusive control due to presence of passenger). Cruz's alternative scenario, that the handgun belonged to Sinclair and that she came to retrieve it despite the presence of several officers, constitutes an invitation to reweigh evidence. Our standard of review precludes us from accepting this invitation. *See Morris v. State*, 114 N.E.3d 531, 537 (Ind. Ct. App. 2018) (concluding that defendant's

argument was improper invitation to reweigh evidence), *trans. denied* (2019).[5]

Cruz's conviction is affirmed.

Affirmed.

Brown, J., and Felix, J., concur.

---

[5] We note that in his reply brief, Cruz attempts to raise new evidence and a related argument as to his whereabouts on the afternoon in question. Reply Br. at 8 n.3. He directs us to one of his other criminal cases (49G01-1905-F4-19929), which he now claims necessitated that he be at a 1:30 p.m. final pretrial hearing on October 22, 2019. He insinuates that his identity as the driver of the black SUV that Flanagan estimated had been at her house for an hour and a half or more would be in doubt, given that the 911 call began around 3:11 p.m.. Stated otherwise, Cruz asserts that he was denied the opportunity to address a potential discrepancy in timing. We find his argument waived. *See Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011) (citing Appellate Rule 46(C) and explaining that party "may not raise an issue … for the first time in a reply brief"). Further, to the extent that such evidence might be characterized as alibi evidence, we have no indication that Indiana Code Section 35-36-4-1's requirements were followed.